**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ORTIZ and JOHN INZALACO, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KENNETH COLE PRODUCTIONS, INC.,<br><br>Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

- 1 -
CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 4

THE PARTIES ............................................................................................... 6

JURISDICTION AND VENUE ...................................................................... 6

SUBSTANTIVE ALLEGATIONS .................................................................. 8

    A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. ................................... 8

    B.    Defendant Falsely Informed Users That They Could Opt Out of or Reject the Website's Use of Cookies. ...................................................... 14

    C.    The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website. ............................................. 29

        1.    The Website Causes the Interception of the Contents of Communications ............................................................................ 29

        2.    Facebook Cookies ........................................................... 31

        3.    Google Cookies ............................................................... 35

        4.    Microsoft Bing Cookies ................................................. 43

        5.    Microsoft Clarity Cookies ............................................. 45

        6.    Adobe Cookies ............................................................... 47

        7.    TikTok Cookies .............................................................. 49

        8.    Taboola Cookies ............................................................. 54

        9.    Additional Third-Party Cookies ..................................... 56

    D.    The Private Communications Collected are Valuable. ................... 59

PLAINTIFFS' EXPERIENCES ..................................................................... 61

CLASS ALLEGATIONS ................................................................................ 68

CAUSES OF ACTION ................................................................................... 70

    First Cause of Action: Invasion of Privacy ......................................... 70

    Second Cause of Action: Intrusion Upon Seclusion ........................... 73

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ......................................... 74

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ....................... 79

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ...............81

Sixth Cause of Action: Unjust Enrichment .....................................................................83

CLASS ACTION COMPLAINT

1    Plaintiffs Jose Ortiz and John Inzalaco ("Plaintiffs") bring this action on behalf of

2    themselves, the general public, and all others similarly situated against Kenneth Cole

3    Productions, Inc. ("Defendant" or "Kenneth Cole"). Plaintiffs' allegations against Defendant are

4    based on information and belief and the investigation of Plaintiffs' counsel, except for allegations

5    specifically pertaining to Plaintiffs, which are based on their personal knowledge.

**INTRODUCTION**

7    1.    This Class Action Complaint concerns egregious violations of consumer privacy

8    and breach of consumer trust in violation of California law. When consumers visit Defendant's

9    ecommerce website (www.kennethcole.com, the "Website"), Defendant displays to them a

10   popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies

11   but expressly gives users the option to control how they are tracked and how their personal data

12   is used by providing the option to click or select a "OPT OUT" button, as shown in the following

13   screenshot, which has been stretched for readability:



This site uses cookies to simplify and improve your usage and experience of this website. Cookies are small text files stored on the device you are using to access this website. If you ignore this message and continue without changing your browser settings, we will assume that you are consenting to our use of cookies. For further information on our use of cookies, please see our Privacy Statement

**OPT OUT**     **ACCEPT**

2.    Like most internet websites, Defendant designed the Website to include resources

and programming scripts from third parties that cause those parties to place cookies and other

similar tracking technologies on visitors' browsers and devices and/or transmit cookies along

- 4 -

CLASS ACTION COMPLAINT

with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.     Even after users elect to opt out of or reject all cookies, including "Analytics Cookies," "Marketing and Retargeting Cookies," and "Functionality Cookies", other than the "Necessary Cookies," Defendant surreptitiously causes several third parties—including Meta Platforms, Inc. (Facebook), Google LLC (Google Analytics), Microsoft Corp. (Microsoft Bing, Microsoft Clarity, and AppNexus), Adobe Inc. (dpm.demdex.net), ByteDance Ltd. (TikTok), Taboola, Inc., PubMatic, Inc. (pubmatic.com), The Trade Desk, Inc. (adsrvr.org), Snap Inc. (Snapchat or tr.snapchat.com), Criteo S.A. (criteo.com), Yotpo Ltd. (yotpo.com), and *many* others  (the "Third Parties")[1]—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website.

4.     Contrary to users' express rejection of cookies and tracking technologies, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.     The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts,

---

[1] Defendant causes **many** other third parties to place and/or transmit tracking cookies that intercept users' private communications after they opt out of cookies, including, but not limited to, Digioh LLC (lightboxcdn.com), AppNexus, Inc., Yotpo Ltd., Magnite, Inc. (Rubicon Project), Index Exchange, Inc. (casalemedia.com), Bidswitch, Inc. (bidswitch.net), TripleLift, Inc. (3lift.com), and OpenX Technologies, Inc. (Openx.net).

etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.      This type of tracking and data sharing is exactly what Website visitors sought to avoid when they adjusted their cookie settings to opt out of or reject cookies. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7.      Plaintiff Jose Ortiz is, and was at all relevant times, an individual and resident of Daly City, California. Plaintiff Ortiz intends to remain in California and makes his permanent home there.

8.      Plaintiff John Inzalaco is, and was at all relevant times, an individual and resident of Vacaville, California. Plaintiff Inzalaco intends to remain in California and makes his permanent home there.

9.      Defendant Kenneth Cole Productions, Inc. is a New York corporation with its headquarters and principal place of business in New York, New York.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11.     The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12.     Further, the Private Communications and data that Defendant causes to be

CLASS ACTION COMPLAINT

transmitted to Third Parties are routed through servers located in California.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDINGS

15.     The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that even though they rejected all non-necessary cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data until they learned of Defendant's privacy violations from their counsel. As alleged below, Plaintiffs do not have the expertise to test whether the Website honored users' requests to reject cookies.

16.     On or about August 3, 2024, Plaintiff Inzalaco notified Defendant that he alleged that Defendant knowingly (and without consent) caused non-necessary third-party cookies and corresponding data to be stored on consumers' devices and/or transmitted to third parties when they visit the Website despite consumers' clear rejection of such third-party cookies. Plaintiff further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

17.     The Website's Terms & Conditions ("T&C") contain an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association ("AAA").

18.     Accordingly, on September 6, 2024, Plaintiff Inzalaco filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. Plaintiff sought a declaration that his claims, which arose from the same conduct alleged herein, were not subject to arbitration.

19.     Arbitrator Franke Burke was appointed to the arbitration.

20.     A preliminary hearing on the arbitration was held on April 28, 2025. On the same date, the Arbitrator issued the Preliminary Hearing and Scheduling Order #1 which ordered the parties to brief the issue of arbitrability.

21.     On May 27, 2025, Plaintiff Inzalaco filed a motion asking the arbitrator to find that his claims were not subject to arbitration.

22.     On June 12, 2025, Defendant's counsel informed the AAA that: "Respondent Kenneth Cole has received and reviewed Claimant's motion regarding non-arbitrability and writes to inform you that it hereby stipulates that claimant John Inzalaco's purported individual CIPA claim is not subject to the arbitration provision on the Kenneth Cole website. As such, Kenneth Cole wishes to withdraw from the arbitration."

23.     On July 1, 2025, the AAA subsequently closed the arbitration. *See* Ex. B.

24.     Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs from discovering their claims sooner. Further, Plaintiffs' claims were equitably tolled by Plaintiff Inzalaco's demand letter on behalf of himself and other Website users and Plaintiff Inzalaco's filing of the arbitration proceeding because Defendant had notice of the claims (and Plaintiff Inzalaco's intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiffs' claims since their claims alleged in this Complaint are substantially similar to those raised in Plaintiff Inzalaco's demand letter and arbitration proceeding. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Inzalaco's pursuit of his claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiffs to pursue their claims in this forum. Plaintiffs acted in good faith and engaged in reasonable conduct in filing the Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

### A.     Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies.

25.     Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to

and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

26.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

27.    As a result, Defendant knew or should have known that the devices used by Plaintiff and Class members to access the Website were located in California.

28.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

29.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website

to identify the device making the requests, and to record a session showing how the user interacts with the website.

30.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

31.    A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; www.google.com; c.bing.com, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

32.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

CLASS ACTION COMPLAINT

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

33.    Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are

utilized to enhance website performance and generate revenue through data collection and targeted advertising.

34.    Defendant is a retailer of clothing, footwear, and fashion accessories. Defendant owns and operates the Website, through which consumers may obtain information about Defendant's products and purchase merchandise. As users interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

35.    Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

36.    Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> Third party cookies: We permit limited third parties to place cookies through the Site to provide us with better insights into the use of the Site or user demographics or to provide relevant advertising to you. These third parties may collect information about a consumer's online activities over time and across different websites when he or she uses our website. For example, we may utilize Google Analytics to analyze usage patterns of the Site. Google Analytics generates a cookie to capture information about your use of the Site which Google uses to compile reports on website activity for us and to provide other related services. Google may use a portion of your IP address to identify their cookie, but this may or may not be associated with any other data held by Google.
>
> We may also permit third party service providers to place cookies through our Site to perform analytic or marketing functions…

CLASS ACTION COMPLAINT

...

To enhance your use of the Website and shopping experience, we or our service providers use cookies (small text files stored in a user's browser) or Web beacons (electronic images that allow us to count users who have accessed particular content and to access certain cookies) to collect aggregate data. You can find more information about cookies and how they work at here. Some cookies we use are necessary to enable you to navigate the Website and use features such as registering or creating and logging in your account. We also use cookies to gather and record information about choices you make on the Website and to allow us to tailor to our visitors. The cookies we or our service providers may use on our Website include:

Necessary Cookies: These cookies are necessary for the Website to function and cannot be switched off in our system. These cookies are usually only set in response to actions made by you which include a request for services, such as setting your privacy preferences or logging into your account.

Analytics Cookies: These cookies allow us to count visits and traffic sources so we can measure and improve the performance of the Website. They help us to know which pages are the most and least popular and see how visitors move around the Website.

Marketing & Retargeting Cookies: These cookies may be set through our site by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverts on other sites. They do not store directly personal information but are based on uniquely identifying your browser and internet device. If you do not allow these cookies, you will experience less targeted advertising.[2]

37.    Defendant further explained the third-party cookies it used on the Website as follows in its Cookie Policy:

**WHAT ARE COOKIES?**

Like most websites, we use cookies and similar technologies to remember things about you so that we can provide you with a better experience. Cookies are small data files stored on your browser or device. They may be served by the entity that operates the website you are visiting ("first-party cookies") or by other companies ("third-party cookies"). Cookies do not cause damage to your computer systems or files.

A Pixel Tag is an electronic image, often a single pixel (1x1), that is ordinarily not visible to Site visitors and may be associated with Cookies on a user's hard drives. Pixel Tags allow us to count users who have visited certain pages of the Site, to deliver branded services, to serve ads, and to help determine the effectiveness of

---

[2] Kenneth Cole Productions Inc.'s Privacy Policy (LAST UPDATED: July 26, 2021) (current version available at https://www.kennethcole.com/pages/privacy-policy) (the "Privacy Policy"). Based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Website.

CLASS ACTION COMPLAINT

promotional or advertising campaigns. When used in HTML-formatted e-mail messages, Pixel Tags can tell the sender whether and when the e-mail has been opened.

**HOW WE USE COOKIES**

We and our service providers may use 'cookies' on the Site. Cookies are data that a web server transfers to an individual's computer for recordkeeping purposes. Cookies can facilitate users' ongoing access to and use of a particular website. For example, we use cookies in the following way:

- First-Party Cookies. These allow you to navigate the site and use our features.
- Third-Party Cookies. We partner with third-party analytics providers, like Google, that set cookies when you visit our web-sites. This helps us understand how you are using our services so that we can improve both the functionality of the Site and your shopping experience.
- Interest-Based Advertising. We may partner with third party service providers to deliver ads relevant to you.[3]

**B.** **Defendant Falsely Informed Users That They Could Opt Out of or Reject the Website's Use of Cookies.**

38.     When Plaintiff and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, in relevant part, "This site uses cookies to simplify and improve your usage and experience of this website…" The banner then purported to provide users the opportunity to "OPT OUT" of the Website's use of cookies, as shown in the following screenshot from the Website:

---

[3] Kenneth Cole Website Cookie Policy (updated 3/10/2020) (current version available at https://www.kennethcole.com/pages/cookie-policy) (the "Cookie Policy"). Based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Website.

39.    Plaintiffs and other Website users who clicked or selected the "OPT OUT" button were then directed to a "Manage Cookie Settings" window, where Defendant expressly represented to its users that they could choose the types of cookies users could choose to not accept, or to otherwise opt out of or reject, including (i) "Analytics Cookies," which allow the Defendant to "count visits and traffic sources so we can measure and improve performance of the website [and] help us to know which pages are the most and lease popular and see how visitors move around the website," (ii) "Marketing and Retargeting Cookies," which allow Defendant to "count visits and traffic sources so we can measure and improve performance of the website [and] help us to know which pages are the most and lease popular and see how visitors move around the website," and (iii) "Functionality Cookies," which "enable our website to offer additional functions and personal settings. They can be set by us or by third-party service providers that we have placed on our pages." Users could apparently opt out of or reject these cookies by adjusting the setting next to each of the above categories of cookies (i.e. by unchecking or de-selecting each check box). The only cookies users could not opt out of or reject were the "Necessary Cookies" that are "necessary for the website to function and cannot be switched off." All of this was as shown in the following screenshot from the Website:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    40.    Users who adjusted the settings in the Manage Cookie Settings window

20  associated with Analytics, Marketing and Retargeting, and Functionality cookies, thereby

21  indicating their choice and/or agreement to opt out of or reject all cookies and tracking

22  technologies in use on the Website, except those "Necessary" for the Website to function, could

23  then continue to browse the Website, as both the popup cookie consent banner and Manage

24  Cookie Settings window disappeared after users also clicked or selected the "Accept Selected"

25  button.

26    41.    Defendant's popup cookie consent banner and Manage Cookie Settings window

27  led Plaintiffs, and all those Website users similarly situated, to believe that they had opted out of

28  or rejected all cookies and tracking technologies, especially those used to measure visitor traffic,

CLASS ACTION COMPLAINT

build a profile of user interests to show them advertising, and enable personal settings. The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" Cookies.

42.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff's or other users' wishes. When Plaintiff and other Website users adjusted settings in the Manage Cookie Settings window to opt out of or reject all cookies, except "Necessary" cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

43.    Nevertheless, even after receiving that notice, Defendant caused the Third Parties' cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

44.    In particular, when users adjusted settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by declining or

rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

45.     Some aspects of the operations of the Third Parties' cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user adjusted settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies:





CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT



46.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.kennethcole.com. The screenshots depict only network traffic occurring *after* the user opted out of or rejected all cookies in the Manage Cookie Settings window. As shown above, despite the user's declination or rejection of all such cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, www.google.com, c.bing.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers opted out of or rejected all such cookies and tracking technologies in the Manage Cookie Settings window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies).

47.    Plaintiff's and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

48.    As users interact with the Website, even after declining or rejecting the use of non-necessary cookies and similar technologies for traffic analytics, marketing and retargeting, and functionality for personalized content, as well as the sale or sharing of the user's personal

information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

49. The Third Party code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

C. **The Private Communications Intercepted and Collected Through Third Party Cookies on Defendant's Website[4].**

1. **The Website Causes the Interception of the Contents of Communications**

---

[4] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had rejected all non-necessary cookies using the Website.

CLASS ACTION COMPLAINT

50.    The Website includes a search bar and other input fields which users enter information. For example, below is a screenshot of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.



51.    When users input the information into the search bar, they intend to communicate the contents of their search directly to the Website.

52.    Instead, Defendant programmed the Website so that the contents of those communications are intercepted by the Third Parties while the communications are in transit between the user's browser and the Website.

53.    For example, the Website causes users' search strings to be transmitted to Google—even after Website users have opted out or rejected all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies). In the example below, the test string "shirt" was sent to Google along with cookie data:



1

2        **2.        Facebook Cookies**

3        54.        Defendant causes third party cookies to be transmitted to and from Website users'

4   browsers and devices to and from the **facebook.com** domain, even after users elect to opt out of

5   or reject all non-necessary cookies (including all Analytics, Marketing and Retargeting, and

6   Functionality cookies). This domain is associated with Meta's digital advertising and analytics

7   platform that collects user information via cookies to assist Meta in performing data collection,

8   behavioral analysis, user retargeting, and analytics.[5] Meta serves targeted ads to web users across

9   Meta's ad network, which spans millions of websites and apps.

10        55.        Cookies help Meta track whether users complete specific actions after interacting

11   with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that

12   advertisers use to measure ad campaign performance. For example, when a clicks a button on

13   the Website, Defendant causes the following data to be transmitted to Meta:

---

[5] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

56.    The "ev" parameter denotes an "Event." In this case, the "event" is a "SubscribedButtonClick," indicating to Facebook that the user has clicked a specific button on

the Website. The "cd[buttonText]" parameter discloses to Facebook the exact text of the button the user clicked. In this case, the text is "NEW."

57.    The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event offurred – in this case, was https://www.kennethcole.com.

58.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

59.    The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

60.    The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

61.    Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the data above:

| Request Header Query Body **Cookies** Raw \| Summary + | |
|---|---|
| **Key** | **Value** |
| datr | F0Sualta8Fr3PFyq-BGFZE2n |
| sb | F0SuaMUy3ZketDP4VyxLttp7 |
| locale | en_US |
| c_user | 1345507951 |
| xs | 25%3AGPglyS2W0kVYyg%3A2%3A17583049 96%3A-1%3A-1 |
| ps_n | 1 |
| fr | 0Gh3wmpCVNQpikjQG.AWd1FHahrpt51nC3xPq NVgZXqb_SIJO1I3WiT-41u0tcZOXEjSs.BozZq1. .AAA.0.0.BozZtD.AWf0lgvyir5QyXa8I9ODz6WF 0zU |
| ar_debug | 1 |

62.    The "c_user" cookie shown above causes Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID causes Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses

CLASS ACTION COMPLAINT

this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

63.    In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[6] These cookies allow Meta to collect data on how users interact with websites, regardless of whether the users has a Facebook account or is logged in.[7]

64.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses)—including whether a user is located in California.[8]

65.    Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

---

[6] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[7] https://allaboutcookies.org/what-data-does-facebook-collect.
[8] *Id.*

CLASS ACTION COMPLAINT

66.     In addition, the Website causes the User's "user-agent" information to be sent to Meta:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/140.0.0.0 Safari/537.36 |
|---|---|

67.     The "user-agent" correspondents to the device and browser that the user has used to access the Website.

68.     Finally, the data sent to Meta includes the user's IP address.

### 3.     Google Cookies

69.     Defendant causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users rejected all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies), to and from the **www.google.com**, **google-analytics.com**, **analytics.google.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[9] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[10] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[11]

---

[9] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[10] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[11] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

70.     Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[12] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

71.     Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[13] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[14]

72.     Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors,

---

[12] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[13] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

[14] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

CLASS ACTION COMPLAINT

(viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[15]

73.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at analytics.google.com:



---

[15] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

| | |
|---|---|
| ir | 1 |
| uaa | arm |
| uab | 64 |
| uafvl | Not%2FA)Brand;8.0.0.0\|Chromium;126.0.6478.61\|Google%20Chrome;126.0.6478.61 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 13.5.1 |
| uaw | 0 |
| are | 1 |
| pae | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | EA |
| _s | 1 |
| sid | 1718924414 |
| sct | 1 |
| seg | 1 |
| dl | https://www.kennethcole.com/search?q=shirt |
| dr | https://www.kennethcole.com/ |
| dt | shirt Search Results \| Kenneth Cole |
| en | page_view |
| _ee | 1 |
| tfd | 1472 |
| _z | sendBeacon |

74.    The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates the non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

75.    The "dl" parameter tells Google twhat webpage the user was viewing on the Website, and the "dt" parameter contains the title of that page.

76.    The "pr1" parameter tells Google the specific product the user was viewing.

CLASS ACTION COMPLAINT

77.    The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

78.    Similar data is sent to https://www.google.com/ads:



79.    The "cid" parameter above refers to "Client ID." It contains a unique identifier for the user's browser and device, that allows Google to link the user to their interactions with the Website.[16]

80.    Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's analytics domain:

---

[16] *See, e.g.*, https://cheatography.com/dmpg-tom/cheat-sheets/google-universal-analytics-url-collect-parameters/; https://www.analyticsmarket.com/blog/how-google-analytics-collects-data/; https://www.owox.com/blog/use-cases/google-analytics-client-id/.

CLASS ACTION COMPLAINT

81. The "NID" cookie is also used for Google advertising.

82. Specifically, it is used to show Google ads to users.[17]

83. The "__Secure-3PAPISID" and "__Secure-3PSID" cookies used on the Website are utilized by Google to build a profile of Website visitor interests to show relevant and personalized ads through retargeting.

---

[17] *See* https://policies.google.com/technologies/cookies?hl=en-US.

CLASS ACTION COMPLAINT

84.     Similar cookie data is also sent to https://www.google.com/ads:



85.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" and IP address information to be sent to Google.



86.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared

CLASS ACTION COMPLAINT

traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

87.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[18]

88.     Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[19] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

---

[18] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[19] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

### 4.    Microsoft Bing Cookies

89.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function, to and from the **bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[20] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[21] Microsoft uses bat.bing.com cookies to "record[] what customers do on [a] website and send[] that information to Microsoft Advertising." [22] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[23]

90.    Bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[24]; gender[25]; age[26] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie. Bat.bing.com keeps this user data for six months.

---

[20] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.

[21] https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

[22] https://help.ads.microsoft.com/#apex/ads/en/56960/1.

[23] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.

[24] https://help.ads.microsoft.com/#apex/ads/en/60212/0.

[25] *Id.*

[26] *Id.*

CLASS ACTION COMPLAINT

91.     Bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads." [27] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[28]

92.     For example, the following cookies are sent to Bing when a user browses the Website after rejecting cookies:



93.     According to Microsoft's documentation, the "MUID" cookie "[i]dentifies unique web browsers visiting Microsoft sites [and is] used for advertising, site analytics, and other operational purposes."[29] The "MSPTC" cookie is "[u]sed by Microsoft Advertising to help deliver more relevant ads, limit how often ads are shown, and measure the effectiveness of advertising campaigns."[30]

---

[27] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[28] https://help.ads.microsoft.com/#apex/ads/en/56680/2.
[29] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-list
[30] https://www.cookie.is/MSPTC

CLASS ACTION COMPLAINT

94.     Microsoft also utilizes bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to deliver highly targeted ads within Microsoft's extensive advertising network. Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[31]

### 5.    Microsoft Clarity Cookies

95.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users adjust settings in the Manage Cookie Settings window to reject all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies), to and from the **clarity.ms** domain. This domain is associated with Clarity, Microsoft's "cutting-edge behavioral analytics tool that helps you understand user interaction with your website or app".[32] Clarity is a Microsoft Advertising tool, which is described as "crucial for successful marketing."[33] "Clarity's tracking code … uses a cookie to obtain user session data." [34]

96.     Clarity allows Defendant to "watch live users in action" via "recordings of live user interactions" on the website, including a user's "clicks or taps, scrolling, navigation, and more."[35] Indeed, Clarity boasts that it "tracks all visitor clicks and scrolls on mobile, desktop, and tablet[.]" These "session recordings" track each and every consumer's individual actions on the website.[36]

---

[31] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.
[32] https://learn.microsoft.com/en-us/clarity/setup-and-installation/about-clarity.
[33] https://about.ads.microsoft.com/en/blog/post/october-2021/introducing-microsoft-clarity-insights-for-microsoft-advertising.
[34] https://learn.microsoft.com/en-us/clarity/setup-and-installation/cookie-consent.
[35] https://clarity.microsoft.com/session-recordings.
[36] *Id.*

CLASS ACTION COMPLAINT



97.     Further, Clarity permits Defendant to aggregate individual users' session recordings into "heatmaps" for Defendant's financial gain. Heatmaps are "visualization tool[s]" aimed at "aggregat[ing] information about how users interact with the website."[37] This allows Defendant to "See at a glance which areas on [web site owner's] page drive the most engagement," a crucial element to increasing advertising revenue.[38] Clarity also permits Defendant to "track a specific subset of users," including tracking metrics like what browser users visited from, what type of device, the date, and more. Clarity even permits the use of specific "Clarity user ID[s]" which permits Clarity to track users across their devices, and identify when the same user visits multiple times to the website.[39] Businesses use Clarity to "make data-driven decisions" to "improve overall conversion rates" of clicks, engagement, or sales.[40] Microsoft notes in a Clarity case study that Clarity cookies permitted businesses to see a "substantial increase" in "purchases."[41] In one instance, "following just five days after implementing Clarity, the [business] saw an uplift of 19% in conversion rate."[42] Businesses consider Clarity a "must-have tool for any business serious about optimizing their website and increasing online revenue."[43]

---

[37] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview.
[38] https://clarity.microsoft.com/heatmaps.
[39] https://clarity.microsoft.com/insights; https://learn.microsoft.com/en-us/clarity/setup-and-installation/identify-api.
[40] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.
[41] *Id.*
[42] *Id.*, emphasis in original.
[43] https://clarity.microsoft.com/case-studies/ecommerce-boost/#:~:text=Using%20Clarity&text=By%20analyzing%20user%20sessions%20and,and%20improve%20overall%20conversion%20rates.

98.     Microsoft collects data from Clarity,[44] which "Microsoft retains . . . for as long as necessary[.]"[45] Clarity cookies allow Microsoft to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) interests and preferences; (iv) shopping behavior; (v) device information; (vi) demographic data; (vii) geolocation data; (viii) referring URL; and (ix) session information.[46]

99.     The type of cookie data sent to Clarity when a user visits the Website is as follows:



100.    According to Microsoft documentation, the MUID cookie "[i]dentifies unique web browsers visiting Microsoft sites", and is "used for advertising, site analytics, and other operational purposes."[47]

101.

### 6.     Adobe Cookies

102.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function, to and from the **demdex.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

103.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains

---

[44] https://www.microsoft.com/en-us/privacy/privacystatement.
[45] *Id.*
[46] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-data.
[47] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-cookies.

CLASS ACTION COMPLAINT

(i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[48] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[49]

104.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[50]

105.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following cookie data to be sent to Adobe's domain, at https://dpm.demdex.net:

---

[48] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[49] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[50] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

CLASS ACTION COMPLAINT

106.    Along with this data, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Adobe:



107.    As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

108.    Finally, the data sent to Adobe includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

**7.    TikTok Cookies**

109.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[51]

---

[51] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center;

CLASS ACTION COMPLAINT

110.    TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[52] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

111.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[53]

112.    For example, the TikTok software code that Defendants cause to be stored on and executed by the Website user's device causes the following type of data to be sent to TikTok's domain, at https://analytics.tiktok.com/api/v2/monitor:

---

Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[52] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[53] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

```
POST  200  https://analytics.tiktok.com/api/v2/pixel/act

Request  Header  Query  Body  Cookies  Raw | Summary  +              PLAIN ⌄

 1 ⌄ {
 2      "event_id": "",
 3      "message_id": "messageId-1718924466451-1739374390721",
 4      "is_onsite": false,
 5      "timestamp": "2024-06-20T23:01:06.451Z",
 6 ⌄    "context": {
 7 ⌄      "ad": {
 8          "sdk_env": "external",
 9          "jsb_status": 2
10        },
11 ⌄      "device": {
12          "platform": "pc"
13        },
14 ⌄      "user": {
15          "anonymous_id": "xKiaHJiYpSv-IA-oOEKoDl_BJip"
16        },
17 ⌄      "pixel": {
18          "code": "C93M7I0SD3104BE202J0",
19          "runtime": "1",
20          "codes": "C93M7I0SD3104BE202J0"
21        },
22 ⌄      "page": {
23          "url": "https://www.kennethcole.com/",
24          "referrer": "",
25          "load_progress": "2"
26        },
27 ⌄      "library": {
28          "name": "pixel.js",
29          "version": "2.2.0"
30        },
```

CLASS ACTION COMPLAINT

```
31        "session_id":
          "db62b1e8-2f58-11ef-9dda-0200170c1a03::VKvItX760DJP6aDVtt24",
32        "pageview_id": "pageId-1710924416398-2023535658578.0.0",
33        "variation_id": "test_2_single_track",
34        "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X
          10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.
          0.0 Safari/537.36",
35        "index": 0
36      },
37      "_inspection": {},
38      "properties": {},
39      "partner": "Shopify",
40 ∨    "signal_diagnostic_labels": {
41 ∨      "raw_email": {
42          "label": "missing"
43        },
44 ∨      "raw_auto_email": {
45          "label": "missing"
46        },
47 ∨      "raw_phone": {
48          "label": "missing"
49        },
50 ∨      "raw_auto_phone": {
51          "label": "missing"
52        },
53 ∨      "hashed_email": {
54          "label": "missing"
55        },
56 ∨      "hashed_phone": {
57          "label": "missing"
58        }
59      },
60      "action": "Click",
61 ∨    "auto_collected_properties": {
62        "page_trigger": "Click",
63 ∨      "trigger_element": {
64          "tag": "A",
65 ∨        "attributes": {
66            "destination": "https://www.kennethcole.com/collections/
              men-apparel"
67          },
68          "inner_text": "",
69          "xpath": "/HTML/body[1]/div[13]/div[2]/div[1]/div[1]/div
              [1]/div[1]/div[1]/div[2]/div[1]/a[1]",
70          "num_child_buttons": 0,
71          "timestamp": "2024-06-20T23:01:06.448Z",
72 ∨        "position": {
73            "x": 0,
74            "y": 125
75          }
76        }
77      }
78  }
```

113.    The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a

CLASS ACTION COMPLAINT

browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[54]

114.    The data further indicates, among other things, that the user clicked a link pointed at the destination https://www.kennethcole.com/collections/men-apparel.

115.    Along with this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:



116.    According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[55]

117.    Further, along with all of this data, the TikTok software code that Defendants cause to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:



As discussed above with respect to Google, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

118.    Finally, the data sent to TikTok includes the user's IP address.

119.    By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement;

---

[54] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

[55] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[56]

120.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[57]

### 8.    Taboola Cookies

121.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function, to and from the **taboola.com** domain.[58] This domain is associated with Taboola, Inc., "one of the world's leading performance advertising platforms for the open web. Through our exclusive partnerships with many of the world's top websites, we help advertisers engage with over 600 million unique daily active users."[59] "Taboola's platform is powered by Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[60] Taboola's technology learns user engagement patterns by analyzing data it collects using

---

[56] *See* TikTok for Business: Using Cookies with TikTok Pixel.
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).
[57] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).
[58] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).
[59] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#.
[60] *Id.*

CLASS ACTION COMPLAINT

cookies about user "reading preferences, browsing history, device, location, time of day and more..."[61]

122.    Taboola cookies enable it to obtain and store at least the following user data: user identifiers, browsing history, visit history, website interactions, user input data (such as email addresses), demographic information (such as gender and age), interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers (i.e., "cookie IDs"), and/or geolocation data.[62] This data allows Defendant to target its advertising campaigns to users based on user "location, time, browser type, connection type, audience segments, and more."[63]

123.    For example, the Taboola software code that Defendant causes to be stored on and executed by the Websites user's device causes the following cookies to be sent to Taboola's domain:



124.    According to Taboola documentation, the "t_gid" cookie "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on interactions with an advertiser or publisher."[64] The cookie does not stays on the consumer's device and does not expire for an entire year.[65]

---

61 *Id.*
62 Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information); *see also* Taboola Cookie Policy (available at https://www.taboola.com/policies/cookie-policy).
63 *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#; *see also* https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences#.
64 https://www.taboola.com/policies/cookie-policy.
65 *Id.*

CLASS ACTION COMPLAINT

125.    Taboola explains in its Privacy Policy the user data it receives from cookies installed on its customers' (such as Defendant) websites  and how it uses (and monetizes) that data to create audience segments as follows:

> We use User Information for the following purposes: … **Offering our Customers data segments that help target content and advertisements for topics, products, and services that may interest you.** A data segment is a grouping of users who share one or more attributes (e.g., travel enthusiasts). We offer a number of data segments, both proprietary and from our data partners, to our Customers so that they may better target Users who are more likely to be interested in their content and advertisements. Taboola does not knowingly create segments that are based upon what we consider to be sensitive information (for example, Personal Data revealing your racial or ethnic origin or your religious affiliations, or Personal Data concerning your sensitive health information, sex life or sexual orientation, or genetic or biometric data). In connection with our Services, our Customers may use these standard health-related segments about non-sensitive conditions such as an inferred interest in health and wellness or over the counter medications. In addition, Taboola offers our Customers standard political-related segments that may indicate general political sentiment, interest in specific political issues, and political party affiliation.[66]

### 9.    Additional Third-Party Cookies

126.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users rejected all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies) in the Manage Cookie Settings window, to and from other domains, including (i) secure.adnxs.com; (ii) pubmatic.com; (iii) adsrvr.org; (iv) tr.snapchat.com; (v) gum.criteo.com; and (vi) p.yotpo.com.

127.    The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[67] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[68] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location,

---

[66] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information) (emphasis in original).
[67] https://cookiepedia.co.uk/host/adnxs.com.
[68] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

CLASS ACTION COMPLAINT

page views, and interactions with websites.[69] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website activity occurring on any device connected to the same network using the same IP address.[70] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[71]

128.    The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[72] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[73] PubMatic uses this data to personalize advertising content and track users across the internet.[74]

129.    The **adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[75] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or

---

[69] *Id*.; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.
[70] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.
[71] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.
[72] *See* www.metrixlab.com.
[73] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.
[74] *Id*.
[75] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).

app usage activity."[76] This data helps The Trade Desk personalize ad content and track users across the internet.[77]

130.    The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[78]

131.    The subdomain **tr.snapchat.com** is associated with Snap Inc. (SnapChat), a social media company that uses its cookies to measure users' conduct across distinct websites to help advertisers target ads.[79] SnapChat uses tr.snapchat.com to collect data on browsing history, choices, and interactions with advertisements.[80] This data helps Snapchat personalize ad content and track users across the internet. For example, the Website causes the "sc_at" cookies to be sent to Snap as the user browses the Website after rejecting cookies:



132.    According to Snap Inc.'s documentation, the "sc_at" cookie is "Used to identify a visitor across multiple domains," meaning that it is a tracking cookie capable of tracking a user even after the user exits the Website and browses other sites.[81] The documentation also confirms that the cookie persists on the user's device for a period of one year. *Id.*

133.    The **criteo.com** domain is associated with Criteo S.A., a digital advertising company that provides online advertisements.[82] Criteo S.A. uses cookies set with the **criteo.com**

[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *See* https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for.
[80] *Id.*
[81] *See* https://www.snap.com/privacy/cookie-information.
[82] *See* https://www.criteo.com/platform/commerce-media-platform/.

CLASS ACTION COMPLAINT

domain to build a unique profile for each website user and to target those users with advertisements.[83] Cookies set with the Criteo.com domain assign a unique identifier to users' browsers and devices, and collect data on user's pages views, behavior on websites, information on user preferences and/or interaction with advertisements, and products users have viewed, put in their digital shopping carts, and/or purchased.[84] Criteo S.A. uses this data to personalize ad content and track users across the internet to, among other things, target, price, place, and schedule advertisements.[85]

134.    The **yotpo.com** domain is associated with Yotpo Ltd., an online marketing company.[86] Yotpo Ltd. uses cookies to collect data to facilitate and optimize marketing campaigns, ad management, sales operations, and manage and deliver advertisements for its products and services.[87] Yotpo uses the yotpo.com domain to collect users' information, which it then supplements with information received from other third parties, including Google Analytics, in order to target advertisements.[88]

135.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

### D.    The Private Communications Collected are Valuable.

136.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without

---

[83] https://www.criteo.com/advertising-guidelines/.
[84] *Id.*; https://cookiepedia.co.uk/cookies/criteo.
[85] *Id.*
[86] *See* https://www.yotpo.com/cookie-policy/.
[87] https://www.yotpo.com/cookie-policy/#:~:text=Our%20use%20of%20Marketing%20Cookies,on%20other%20websites%20and%20applications.
[88] *Id.*

CLASS ACTION COMPLAINT

their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

137.    The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular clothing and fashion accessories and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

138.    Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader consumer clothing and fashion accessories market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

139.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[89] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

140.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

---

[89] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

141.    By falsely representing consumers' ability to opt out of or reject non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies), and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## PLAINTIFFS' EXPERIENCES

**Jose Ortiz**

142.    Plaintiff Ortiz visited the Website to seek and obtain information about Kenneth Cole's products, while located in California, on one or more occasions during the last four years.

143.    Plaintiff Ortiz's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Ortiz is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

144.    In particular, during the course of Plaintiff Ortiz's visits to the Website, Plaintiff Ortiz affirmatively navigated the Website by clicking and selecting navigational links at the top of the homepage, including "Men" and "Cologne." Plaintiff Ortiz also clicked on and viewed product pages and read product reviews. Although Plaintiff Ortiz ultimately did not complete a transaction, these actions constituted substantive communications to the Website conveying his selections and preferences.

145.    When Plaintiff Ortiz visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "OPT OUT" button. Plaintiff Ortiz viewed Defendant's representation on the popup cookie consent banner that, "This site uses cookies to simplify and improve your usage and experience of this website…" Plaintiff Ortiz also viewed Defendant's additional representation that, rather than choosing to "ACCEPT" such cookies, users could instead "OPT OUT" of cookies.

146.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Ortiz selected and clicked the "OPT OUT" button, which caused Defendant's "Manage Cookie Settings" window to appear. There, Plaintiff Ortiz saw Defendant's representation that he could adjust the Website's settings to opt out of or reject cookies by clicking or selecting a check box associated with each category of cookies in use on the Website, including Analytics Cookies, Marketing and Retargeting Cookies, and Functionality Cookies. The only category of cookies with a setting that Plaintiff Ortiz could not adjust were the "Necessary Cookies" that Defendant represented "are necessary for the website to function and cannot be switched off in our system." Accordingly, Plaintiff Ortiz adjusted the settings next to the Analytics, Marketing and Retargeting, and Functionality cookies, unchecking or de-selecting all of them, except "Necessary" cookies, which had a setting he could not adjust. Plaintiff Ortiz clicked or selected the "ACCEPT SELECTED" button and proceeded to browse the Website.

147.    Plaintiff Ortiz believed that adjusting settings associated with all categories of cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies, using the options found in the Website's Manage Cookie Settings window would allow him to opt out of and/or reject all non-necessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other companies for the purposes of providing traffic analytics, targeted advertising, and personalized content).

148.    In adjusting settings in the Manage Cookie Settings window to opt out of or reject all cookies, except "Necessary" cookies, Plaintiff Ortiz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Ortiz specifically rejected, based on Defendant's representations, those cookies used for "personalization, website usage and performance measurement, and targeted advertising" and that share information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff Ortiz continue browsing the Website.

149.    Even before either the popup cookie consent banner or Manage Cookie Settings window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for traffic analytics, marketing and retargeting, and functionality for personalized content, to be placed on Plaintiff Ortiz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Ortiz's knowledge. Accordingly, the Website's cookie preferences window representation to Plaintiff Ortiz that he could opt out of or reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Ortiz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

150.    Then, as Plaintiff Ortiz continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Manage Cookie Settings window, and despite Plaintiff Ortiz's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing traffic analytics, marketing and retargeting, and functionality for personalized content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Ortiz's Private Communications as he browsed the Website.

151.    Defendant's representations that consumers could opt out of or reject cookies, except "Necessary" cookies, while Plaintiff Ortiz and users browsed the Website, or at least those involved in providing traffic analytics, targeted advertising, and personalized content, were untrue. Had Plaintiff Ortiz known this fact, he would not have used the Website. Moreover, Plaintiff Ortiz reviewed the popup cookie consent banner and Manage Cookie Settings window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt out of or reject all non-necessary cookies (including all Analytics, Marketing and Retargeting, and

CLASS ACTION COMPLAINT

1  Functionality cookies), Plaintiff Ortiz would have noticed it and would not have used the

2  Website or, at a minimum, he would have interacted with the Website differently.

3  152.  Plaintiff Ortiz continues to desire to browse content featured on the Website.

4  Plaintiff Ortiz would like to browse websites that do not misrepresent that users can opt out of

5  or reject all non-necessary cookies and tracking technologies (including all Analytics, Marketing

6  and Retargeting, and Functionality cookies). If the Website were programmed to honor users'

7  requests to opt out of or reject all non-necessary cookies and tracking technologies, Plaintiff

8  Ortiz would likely browse the Website again in the future, but will not do so until then.

9  153.  Plaintiff Ortiz regularly visits websites that feature content similar to that of the

10  Website. Because Plaintiff Ortiz does not know how the Website is programmed, which can

11  change over time, and because he does not have the technical knowledge necessary to test

12  whether the Website honors users' requests to opt out of or reject all non-necessary cookies and

13  tracking technologies, Plaintiff Ortiz will be unable to rely on Defendant's representations when

14  browsing the Website in the future absent an injunction that prohibits Defendant from making

15  misrepresentations on the Website. The only way to determine what network traffic is sent to

16  third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools.

17  As the name suggests, such tools are designed for use by "developers" (i.e., software developers),

18  whose specialized training enables them to analyze the data underlying the HTTP traffic to

19  determine what data, if any, is being sent to whom. Plaintiff Ortiz is not a software developer

20  and has not received training with respect to HTTP network calls.

21  **John Inzalaco**

22  154.  Plaintiff Inzalaco visited the Website to seek and obtain information about

23  Kenneth Cole's products, while located in California, on one or more occasions during the last

24  four years, including but not limited to, June 2022.

25  155.  Plaintiff Inzalaco's visits to the Website were consistent with an ordinary Website

26  user's visits seeking information about Defendant's products. Specifically, Plaintiff Inzalaco is

27  not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or

28  evaluate Defendant's privacy practices.

CLASS ACTION COMPLAINT

156.    In particular, during the course of Plaintiff Inzalaco's visits to the Website, Plaintiff Inzalaco affirmatively navigated the Website by clicking and selecting navigational links at the top of the homepage, including "Men" and "Suits & Suit Separates," and by entering specific search terms into the Website's search box, such as "shoes" and "sneaker soled dress shoes." Plaintiff Inzalaco also viewed product pages and added selected items to his online shopping cart, reflecting his product interests and intended purchases. Although Plaintiff Inzalaco ultimately did not complete a transaction, these actions constituted substantive communications to the Website conveying his selections, preferences, and purchasing intent.

157.    When Plaintiff Inzalaco visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "OPT OUT" button. Plaintiff Inzalaco viewed Defendant's representation on the popup cookie consent banner that, "This site uses cookies to simplify and improve your usage and experience of this website…" Plaintiff Inzalaco also viewed Defendant's additional representation that, rather than choosing to "ACCEPT" such cookies, users could instead "OPT OUT" of cookies.

158.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Inzalaco selected and clicked the "OPT OUT" button, which caused Defendant's "Manage Cookie Settings" window to appear. There, Plaintiff Inzalaco saw Defendant's representation that he could adjust the Website's settings to opt out of or reject cookies by clicking or selecting a check box associated with each category of cookies in use on the Website, including Analytics Cookies, Marketing and Retargeting Cookies, and Functionality Cookies. The only category of cookies with a setting that Plaintiff Inzalaco could not adjust were the "Necessary Cookies" that Defendant represented "are necessary for the website to function and cannot be switched off in our system." Accordingly, Plaintiff Inzalaco adjusted the settings next to the Analytics, Marketing and Retargeting, and Functionality cookies, unchecking or de-selecting all of them, except "Necessary" cookies, which had a setting he could not adjust. Plaintiff Inzalaco clicked or selected the "ACCEPT SELECTED" button and proceeded to browse the Website.

159.    Plaintiff Inzalaco believed that adjusting settings associated with all categories of cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies, using the options found in the Website's Manage Cookie Settings window would allow him to opt out of and/or reject all non-necessary cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or other companies for the purposes of providing traffic analytics, targeted advertising, and personalized content).

160.    In adjusting settings in the Manage Cookie Settings window to opt out of or reject all cookies, except "Necessary" cookies, Plaintiff Inzalaco gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Inzalaco specifically rejected, based on Defendant's representations, those cookies used for "personalization, website usage and performance measurement, and targeted advertising" and that share information with third parties for these and other purposes. In reliance on these representations and promises, only then did Plaintiff Inzalaco continue browsing the Website.

161.    Even before either the popup cookie consent banner or Manage Cookie Settings window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for traffic analytics, marketing and retargeting, and functionality for personalized content, to be placed on Plaintiff Inzalaco's device and/or transmitted to the Third Parties along with user data, without Plaintiff Inzalaco's knowledge. Accordingly, the Website's cookie preferences window representation to Plaintiff Inzalaco that he could opt out of or reject the use and/or placement of all unnecessary cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Inzalaco believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

162.    Then, as Plaintiff Inzalaco continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Manage Cookie Settings window,

and despite Plaintiff Inzalaco's clear declination or rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing traffic analytics, marketing and retargeting, and functionality for personalized content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Inzalaco's Private Communications as he browsed the Website.

163.    Defendant's representations that consumers could opt out of or reject cookies, except "Necessary" cookies, while Plaintiff Inzalaco and users browsed the Website, or at least those involved in providing traffic analytics, targeted advertising, and personalized content, were untrue. Had Plaintiff Inzalaco known this fact, he would not have used the Website. Moreover, Plaintiff Inzalaco reviewed the popup cookie consent banner and Manage Cookie Settings window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt out of or reject all non-necessary cookies (including all Analytics, Marketing and Retargeting, and Functionality cookies), Plaintiff Inzalaco would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

164.    Plaintiff Inzalaco continues to desire to browse content featured on the Website. Plaintiff Inzalaco would like to browse websites that do not misrepresent that users can opt out of or reject all non-necessary cookies and tracking technologies (including all Analytics, Marketing and Retargeting, and Functionality cookies). If the Website were programmed to honor users' requests to opt out of or reject all non-necessary cookies and tracking technologies, Plaintiff Inzalaco would likely browse the Website again in the future, but will not do so until then.

165.    Plaintiff Inzalaco regularly visits websites that feature content similar to that of the Website. Because Plaintiff Inzalaco does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to opt out of or reject all non-necessary cookies and tracking technologies, Plaintiff Inzalaco will be unable to rely on Defendant's representations

1

2

3

4

5

6

7

when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Inzalaco is not a software developer and has not received training with respect to HTTP network calls.

8

## CLASS ALLEGATIONS

9

10

11

12

166.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

13

14

15

**Class**: All persons who browsed the Website in the State of California after adjusting settings in the "Manage Cookie Settings" window to opt out of or reject all non-necessary cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies.

16

17

18

167.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

19

20

21

22

23

168.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

24

25

26

27

28

169.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to opt out of or reject all non-necessary cookies and tracking technologies on the

Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

170.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether Defendant's actions violate California laws invoked herein; and

b.    Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

171.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Website, opted out of or rejected all non-necessary cookies, and had their confidential Private Communications intercepted by the Third Parties.

172.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

173.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the

impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

174. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

175. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

176. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

177. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could opt out of or reject all Analytics, Marketing and Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function, and related tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the

Website and, when presented with the popup cookies consent banner and Manage Cookie Settings window on the Website, Plaintiffs and Class members opted out of or rejected all non-necessary cookies, and reasonably expected that their declination or rejection of all such cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they opted out of or rejected all such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

178.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

179.    Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles

are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

180.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

181.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

182.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

183.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

184.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

185.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of non-necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

1

**Second Cause of Action: Intrusion Upon Seclusion**

2      186.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

3      187.   To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that

4  Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had

5  a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a

6  reasonable person.

7      188.   By permitting third-party cookies to be stored on consumers' devices without

8  consent, which caused the Third Parties to track and collect Plaintiffs' and Class members'

9  Private Communications, including their browsing history, visit history, website interactions,

10  user input data, demographic information, interests and preferences, shopping behaviors, device

11  information, referring URLs, session information, user identifiers, and/or geolocation data, in

12  violation of Defendant's representations otherwise in the popup cookie consent banner,

13  Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant

14  effectively placed the Third Parties in the middle of communications to which they were not

15  invited, welcomed, or authorized.

16      189.   The Third Parties' tracking and collecting of Plaintiffs' and Class member's

17  Private Communications on the Website using third-party cookies that Defendant caused to be

18  stored on users' devices—and to be transmitted to Third Parties—was not authorized by

19  Plaintiffs and Class members, and, in fact, those Website users specifically chose to opt out of

20  or reject all non-necessary cookies.

21      190.   Plaintiffs and the Class members had an objectively reasonable expectation of

22  privacy surrounding their Private Communications on the Website based on Defendant's

23  promise that users could opt out of or reject all cookies, including all Analytics, Marketing and

24  Retargeting, and Functionality cookies, other than those "Necessary" for the Website to function,

25  as well as state criminal and civil laws designed to protect individual privacy.

26      191.   Defendant's intentional intrusion into Plaintiffs' and other users' Private

27  Communications would be highly offensive to a reasonable person given that Defendant

28  represented that Website users could adjust settings in the Manage Cookie Settings window to

opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers opted out of or rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they opted out of or rejected all unnecessary cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

192.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

193.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

194.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

195.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of non-necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### **Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

196.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

197.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

198.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

199.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

200.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

201.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

202.    Defendant is a "person" within the meaning of California Penal Code § 631.

203.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

204.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties— constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

205.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

206.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

207.    At all relevant times, the Website caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

208.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

209.    The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

210.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

211.    Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to adjust settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies.

212.    The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

213.    Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

214.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

215.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to clothing, shoes, and fashion accessories. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to opt out of or reject all non-necessary cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

### <u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)

216.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

217.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

218.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

219.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire

or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

220.     The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

221.     At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

222.     Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

223.     Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by adjusting settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except the "Necessary" cookies.

224.     Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

225.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

226.   Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

227.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

228.   Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies.

229.   However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted settings in the Manage Cookie Settings window to opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to opt out of or reject all such cookies.

230.   These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to opt out of or reject all non-necessary cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs

- 81 -

and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing him and them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

231.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

232.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

233.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

234.    Defendant's representation that consumers could opt out of or reject all cookies, including Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies (including those cookies used for "personalization, website usage and performance measurement, and targeted advertising") if they adjusted the settings in the Manage Cookie Settings window, was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Manage Cookie Settings window prior to their interactions with the Website. Had Defendant disclosed that it caused unnecessary third-party non-necessary cookies to be stored on Website visitors' devices that are related to traffic analytics, marketing and retargeting, and functionality for personalized content, and/or share information with third

parties even after they choose to opt out of or reject all such non-necessary cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

235.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to opt out of or reject all non-necessary cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

236.    Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

237.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

238.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination or rejection of the Website's use of non-necessary cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

239.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

240.    Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

241.    Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could opt out of or reject all cookies, including all Analytics, Marketing and Retargeting, and Functionality cookies, except "Necessary" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users'

Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members opted out of or rejected all such cookies.

242.    Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

243.    Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

244.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

245.    It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

246.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

247.    Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

248.    Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: January 22, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# Exhibit A

1

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)

2
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)

3
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)

4
  kali@gutridesafier.com
100 Pine Street, Suite 1250

5
San Francisco, CA 94111
Telephone: (415) 639-9090

6
Facsimile:  (415) 449-6469

7
*Attorneys for Claimant*

8
## AMERICAN ARBITRATION ASSOCIATION

9
## SAN FRANCISCO REGIONAL OFFICE

10
JOHN INZALACO,

11
                              Claimant,

12
        v.

13
KENNETH COLE PRODUCTIONS, INC.,

14
                              Respondent.

Arbitration Case No.

**COMPLAINT AND DEMAND FOR ARBITRATION**

15

16
        Claimant John Inzalaco ("Claimant") brings this action against Kenneth Cole

17
Productions, Inc. ("Respondent" or "Kenneth Cole"). Claimant's allegations against Kenneth

18
Cole are based upon information and belief and upon investigation of Claimant's counsel, except

19
for allegations specifically pertaining to Claimant, which are based upon Claimant's personal

20
knowledge. Claimant files this Complaint and Arbitration Demand without waiver of any right

21
or argument, specifically, and without limitation, that he did not assent to the Kenneth Cole

22
website's Terms of Use, including the arbitration agreement contained therein, and/or that the

23
purported arbitration agreement is unlawful and/or unenforceable.

24
## INTRODUCTION

25
        1.      This Complaint and Arbitration Demand concerns one issue: whether a valid and

26
enforceable arbitration agreement was formed between the parties to cover a separate dispute

27
about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this

28
proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

Respondent's website (www.kennethcole.com, the "Website"), where, despite Claimant's agreement with Respondent that it would not place tracking cookies on his device, Respondent proceeded to do so anyway. As is relevant to the instant dispute, the Website also contains "Terms & Conditions" ("TOU" or "Terms") with an arbitration provision purporting to require "[a]ll claims" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Accordingly, he files this arbitration demand to seek a declaration from the arbitrator that his underlying cookie dispute with Respondent is not subject to arbitration.

2.     The Website's TOU are available on the Website but accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3.     When Claimant visited the Website, he did not see or otherwise assent to the TOU before choosing to "OPT OUT" of all cookies, including "Analytics," "Marketing and Retargeting," and "Functionality" cookies, except the "Necessary Cookies" that Claimant was unable to reject, before browsing the website. Accordingly, Claimant made no agreement to arbitrate his underlying cookie dispute.

## BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4.     This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5.     However, at least until placed on notice by Claimant,[1] the Website presented all visitors immediately with a pop-up cookies banner indicating that, rather than accepting all

---

[1] On or about June 25, 2024, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq*., and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq*.

cookies, users can select or click a button to "OPT OUT" of cookies, as shown in the following screenshot:



6.    Users who selected the "OPT OUT" button were directed to a "Manage Cookie Settings" window, where Respondent represented that users could opt out of or reject several categories of cookies, including "Analytics," "Marketing and Retargeting," and "Functionality" cookies, by adjusting the settings associated with those cookies, except "Necessary Cookies," where the associated setting could not be adjusted. Thousands of visitors to the Website, including Claimant, did just that—they selected or clicked the "OPT OUT" button, adjusted the settings to indicate their choice/agreement to reject all cookies, including "Analytics," "Marketing and Retargeting," and "Functionality" cookies, except the "Necessary Cookies" that Claimant and users were unable to reject, and then proceeded to browse the Website. The choices as they appeared to Claimant on the "Manage Cookie Settings" window are as shown in the following screenshot:

COMPLAINT AND DEMAND FOR ARBITRATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17     7.     Unbeknownst to Claimant and other users, however, Respondent nonetheless

18  caused cookies—both from Respondent and third parties with notorious privacy records,

19  including Pubmatic, stickyadstv, adnxs, Google, Facebook, Rubicon Project, Tapad, Bing,

20  Bidswitch, Clarity, adsrvr, and Snapchat, among many others—to be stored on the devices and

21  browsers of Claimant and those similarly situated, despite their rejections of all such cookies. As

22  a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data

23  about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's

24  representations and Claimant's express directions. Respondent brings this arbitration solely to

25  establish that the separate cookie dispute is not arbitrable.

26

27

28

COMPLAINT AND DEMAND FOR ARBITRATION

**PARTIES**

8.      Claimant John Inzalaco is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

9.      Respondent Kenneth Cole Productions, Inc. is a New York corporation with its headquarters and principal place of business in New York, New York. Respondent does business in California through its Website.

**SUBSTANTIVE ALLEGATIONS**

A.      **Respondent's Unenforceable Browsewrap Agreement.**

10.     Respondent's Website includes a TOU that purports to govern the use of the Kenneth Cole Website. *See* TOU ("Your use of the Kenneth Cole website located at www.kennethcole.com … constitutes your agreement to follow and be bound by these Terms & Conditions (the 'Agreement'). If you do not agree to the Agreement, you should not access or use the Site."). It is located at the following address: https://www.kennethcole.com/pages/terms-conditions.

11.     The TOU purports to require Website users to arbitrate all disputes with Respondent through the AAA. *See* TOU ("All claims arising out of or relating to this Agreement (including formation, performance and breach), the parties' relationship with each other and/or your use of the Site shall be finally settled by binding arbitration administered on a confidential basis by the American Arbitration Association (the 'AAA') in accordance with the provisions of its Consumer Arbitration Rules, excluding any rules or procedures governing or permitting class actions.").

12.     Further, the TOU purports to grant exclusive authority to the arbitrator to determine issues of arbitrability: "The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement…"

13.     Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to

unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the TOU, or even the hyperlink to "Terms & Conditions," and thus had no actual notice that his continued browsing of the Website would be subject to an arbitration agreement.

14.     Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such as clicking a button or checking a box, that unambiguously manifested his assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

15.     When users visited the Website, Respondent immediately displayed to them a pop-up cookies banner which prompted users to either "ACCEPT" cookies or "OPT OUT" of cookies. The pop-up cookies banner remains displayed until users select an option on the banner. The pop-up cookies banner made no mention of the Website's TOU, contained no link to the TOU, and did not require the user to manifest assent to the Terms.

16.     Website users, such as Claimant, who clicked the "OPT OUT" button on the pop-up cookies banner to indicate their choice and/or agreement to "OPT OUT" of cookies were directed to an additional "Manage Cookie Settings" window. This window, like the cookies popup banner, made no mention of the TOU.

17.     After making their selections in the Manage Cookie Settings window, users could then continue to browse the Website, as both the pop-up cookies banner and Manage Cookie Settings window disappeared.

18.     The only link to the TOU appeared in small font (identical to the surrounding font) at the bottom of the Website as the last item under the "About" sub-heading, requiring any user to scroll through all Website content, as shown in the following screenshot:

(Screenshot of Kenneth Cole Website showing location of Terms & Conditions link).

19. The link to the TOU at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font, or size from the surrounding text, nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it with no forewarning of being bound by the Terms.

20. Respondent never required Claimant to manifest consent to the TOU. Respondent purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B.     Claimant's Experiences**

21. During the last year, Claimant visited the Kenneth Cole Website to browse products.

22. When Claimant visited the Kenneth Cole Website, the Website immediately presented him with Respondent's pop-up cookies banner as it appeared at the time.

23. Consistent with his typical practice in rejecting cookies and/or the sale of his personal data, Claimant selected or clicked the "OPT OUT" button. Claimant was then presented with Respondent's "Manage Cookie Settings" window then in effect at the time. Claimant

adjusted the settings to indicate his choice/agreement to reject all cookies, including "Analytics," "Marketing and Retargeting," and "Functionality" cookies, except the "Necessary Cookies" which Claimant was unable to reject. Further, Claimant specifically rejected those cookies that would enable the sale or sharing of his personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

24.     Claimant did not see the TOU link—or the actual TOU—on the Website prior to rejecting all such cookies, or at any point thereafter. Moreover, Claimant was immediately presented with Respondent's pop-up cookies banner when he visited the Website, prompting his agreement to "OPT OUT" of cookies prior to his further browsing the Website. The link to Respondent's TOU was hidden in small font at the very bottom of the Website, which he did not view prior to making his choice/agreement to reject all such cookies, or at any time.

## <u>CAUSE OF ACTION</u>

**Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration**

25.     Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

26.     The Kenneth Cole Website's TOU purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU states the following:

> Agreement to Binding Arbitration. If the parties do not reach an agreed upon solution within a period of thirty (30) days from the time informal dispute resolution is pursued pursuant to Section 19.1 above, then either party may initiate binding arbitration. All claims arising out of or relating to this Agreement (including formation, performance and breach), the parties' relationship with each other and/or your use of the Site shall be finally settled by binding arbitration administered on a confidential basis by the American Arbitration Association (the 'AAA') in accordance with the provisions of its Consumer Arbitration Rules, excluding any rules or procedures governing or permitting class actions. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The arbitrator's award shall be binding on the parties and may be entered as a judgment in any court of competent jurisdiction.

The interpretation and enforcement of this Agreement shall be subject to the Federal Arbitration Act.

…

No Class Action and Class Arbitration Waiver. The parties further agree that any arbitration shall be conducted in their individual capacities only and not as a class action or other representative action, and the parties expressly waive their right to file a class action or seek relief on a class basis. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration provision set forth above in Section 19.2 shall be deemed null and void in its entirety and the parties shall be deemed to have not agreed to arbitrate disputes.

TOU (available at https://www.kennethcole.com/pages/terms-conditions).

27.     Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

28.     The link to the TOU was inconspicuous and failed to provide reasonably prudent users, such as Claimant, with actual notice that their continued use of the Website would subject them to the TOU.

29.     Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

30.     Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

31.     Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

32.     An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

33.     For reasonable attorneys' fees and the costs incurred; and

34.     For such further relief as may be just and proper.

Dated: September 6, 2024

**GUTRIDE SAFIER LLP**

_/s/ Seth A. Safier_
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

_Attorneys for Claimant_

# Exhibit B



Western Case Management Center
Sophia Parra
Assistant Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

July 1, 2025

Seth A. Safier, Esq.
Gutride Safier LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Camille A. Brooks, Esq.
Katten Muchin Rosenman LLP
2121 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Via Email to: Camille.brooks@katten.com

Case Number: 01-24-0007-6344

John Inzalaco
-vs-
Kenneth Cole Productions, Inc.

Dear Parties:

On July 1, 2025, the American Arbitration Association (AAA) reviewed and finalized the billing for this matter and closed this case as dismissed.

Please note that the AAA WebFile® ECF Guidelines will not apply after the closing of the case. Therefore, any additional submissions from the parties in this matter should be submitted via email to the AAA, with copies sent to all other parties.

Any outstanding balances incurred during the case remain due and payable to the AAA, even after closing the case. Monthly invoices will continue to be issued until the balance is paid. The AAA will process any refund due to a party as soon as possible.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the stated closing date.

We thank Arbitrator Burke, who is receiving a copy of this correspondence, for serving on this matter.

Thank you for choosing the AAA to administer your arbitration.

Sincerely,
/s/
*Diana Moore on behalf of*
Christina Negrete
Manager of ADR Services
Direct Dial: (559)475-6265
Email: ChristinaNegrete@adr.org
Fax: (855)433-3046


cc:
Patrick Branson, Esq.
Ashley Brines
Kali R. Backer, Esq.
Madeleine Wykstra
Marie A. McCrary, Esq.
Stuart M. Richter, Esq.
Malinda M. Washington
Kenneth Cole